UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-11659-GAO

SDCO ST. MARTIN, INC.,
Plaintiff,

v.

CITY OF MARLBOROUGH,
Defendant.

OPINION AND ORDER
March 20, 2014

O'TOOLE, D.J.

## I. Introduction

The plaintiff, SDCO St. Martin ("St. Martin"), owns a building that is located partly in the City of Marlborough (the "City") and partly in the Town of Southborough, straddling the border between those municipalities. For a number of years, St. Martin has made payments to the City under an agreement made between the City and a prior owner of the parcel on which the building sits that were characterized then (and still are by the City) as "payments in lieu of taxes" ("PILOT"). St. Martin by this action seeks a declaratory judgment that the payments are an illegal tax under Massachusetts law. The City has counterclaimed for breach of the PILOT agreement, seeking to recover what it claims are past underpayments. The parties have filed cross-motions for summary judgment as a matter of law on the basis of a record of undisputed facts.

## II. Factual Background

The relevant undisputed facts are these: In the 1980s, Paul Maggiore owned land that straddled the border between Marlborough and Southborough. In 1987, Maggiore decided to

build a building on the property that would be mostly in Southborough, but partly in Marlborough. As part of the development process, he negotiated with the City about connecting the building to the City's water and sewer system. Southborough does not provide sewer services to its residents.

Maggiore and the City signed an agreement in May 1987 (the "1987 Agreement"). The key provisions of that agreement, as relevant here, were as follows:

> 3. Upon certification that the "Maggiore Group" has acquired all of the preliminary approvals, including the industrial user sewer permit, the City shall allow the connection from the within-described property to the City sewer system.
>
> 4. In consideration for the connection to the City sewer system, the "Maggiore Group" shall make an annual payment in "lieu of taxes" in accordance with the following schedule.
>
> The "Maggiore Group" shall pay the sum of Fifty Thousand ($50,000.) Dollars to the City on the date that the first (1st) phase is connected to the City sewer system. The annual payment shall be increased to One Hundred Thousand ($100,000.) on the date the second (2nd) phase is tied to the first phase or otherwise connected to the City sewer system or on the first legal day of January 1990, whichever is sooner. . . .
>
> On the first legal day in January on the eleventh year of this contract, the annual payment in lieu of taxes shall be increased to One Hundred Fifty Thousand ($150,000.) Dollars; thereafter, the annual payment shall be increased each year in accordance with the Boston Consumer Price Index.

Mertineit Aff., Ex. 5 at 2.

> The 1987 Agreement further provided:
>
> All successors in title to the "Maggiore Group" shall be subject to this Agreement to be recorded at the Middlesex South District Registry of Deeds.

It is undisputed that the 1987 Agreement was not recorded at the registry of deeds.

Maggiore connected sewer lines from the new building to a pre-existing public sewer at his own expense, with no expense to the City. The connection is located entirely within the City,

2

running across easements granted to the plaintiff's property.[1] The cost of the connection was $2,000.

In 1998, the property was sold by the Maggiore trust to Taurus-495 West Technology Partnership, and four years later St. Martin acquired it from Taurus-495. Neither the deed from the Maggiore trust to Taurus-495 nor the deed from Taurus-495 to St. Martin made any reference to the 1987 Agreement. Since it was not recorded, a title search would not have revealed its existence. Nonetheless, both Taurus-495 and St. Martin continued to make the annual payment to the City in addition to regular water and sewer fees and regular real estate property taxes assessed on the portion of the property (including part of the building) located within the City. There is no evidence that St. Martin knew of the 1987 Agreement; it appears that it (like Taurus-495) simply continued making payments that its predecessor had been making. St. Martin's records referred to the payments generally as a "water/sewer fee" or "w/s fee." When received by the City, the PILOT payments were deposited in the City's general fund. It is undisputed that the amounts to be paid under the 1987 Agreement were calculated to approximate what the Maggiore (and successors) would hypothetically have owed the City in real estate taxes if the building had been located entirely in Marlborough, rather than partly in Marlborough but mostly in Southborough.

In 2012, after a change of management companies, a representative of St. Martin became curious about the annual payment and made inquiry of the City. The City then furnished a copy of the 1987 Agreement. The City also asserted that recent years' payments had not been upwardly adjusted according to the CPI and demanded that St. Martin make up close to half a

---

[1] The City contests the validity of the easements. This dispute is immaterial.

million dollars in what the City claimed were overdue past obligations. When St. Martin refused the demand, the City threatened to cut off the sewer connection. This suit followed.

## III. Discussion

The dispute is governed by Massachusetts municipal law.[2] It turns in part upon the scope of a municipality's lawful power to tax, and in part upon the distinction between a tax and a fee.

It is a first principle that in Massachusetts "[c]ities and towns have no independent power of taxation." Opinion of the Justices, 393 N.E.2d 306, 310 (Mass. 1979). "A municipality does not have the power to levy, assess, or collect a tax unless the power to do so in a particular instance is granted by the Legislature." Silva v. City of Attleboro, 908 N.E.2d 722, 725 (Mass. 2009). Marlborough has and exercises the same power granted to other municipalities to tax real property within its city limits, and St. Martin, like its predecessor owners of the property at issue, has paid regularly assessed real estate taxes to the City. As noted above, the PILOT amount was calculated to reflect what the municipal real estate tax might be if the building in question, instead of being only partly in Marlborough, were hypothetically located entirely within the City. It should go without saying (or citation) that the City lacks authority to tax hypothetical property.[3]

In addition to general taxes, a municipality may also charge fees for the use of specific municipally-provided services or as an exercise of police power. See Denver St. LLC v. Town of Saugus, 970 N.E.2d 273, 274 (Mass. 2012). "There are two kinds of fees, 'user fees based on the rights of the entity as proprietor of the instrumentalities used' and 'regulatory fees,' 'founded on police power to regulate particular businesses or activities.'" Id. (quoting Emerson College v.

---

[2] This Court's jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332.
[3] Calling the payments under the 1987 Agreement "payments in lieu of taxes" is unreal. St. Martin has paid and continues to pay the actual taxes assessed. The payments under the agreement are actually payments "in lieu of" taxes that are not actually owed.

4

City of Boston, 462 N.E.2d 1098, 1105 (Mass. 1984)). Sewer charges would be an example of a lawful user fee. See Town of Winthrop v. Winthrop Housing Authority, 541 N.E.2d 582, 583-84 (Mass. App. Ct. 1989).

Whether a charge is a lawful fee or an unlawful tax "must be determined by its operation rather than its specially descriptive phrase." Denver Street, 970 N.E.2d at 275. In Emerson College, the Supreme Judicial Court identified the three traits that distinguish fees from taxes.

> Fees "[1.] are charged in exchange for a particular government service which benefits the party paying the fee in a manner 'not shared by other members of society' [;] ... [2.] are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge"[;] ... "and" [3.] ... are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses.

Denver St., 970 N.E.2d at 275 (alteration in original) (quoting Emerson College, 462 N.E.2d at 1105).[4]

The City provides sewer services to residents[5] of Marlborough, including of course St. Martin, and charges them for the use. St. Martin has paid the sewer usage fees charged by Marlborough. Accordingly, the payments under the 1987 Agreement cannot be justified as user fees for the use of the Marlborough sewer system. The parties to that agreement, in paragraph 15,

---

[4] The City relying on Anderson St. Assocs. v. City of Boston, 817 N.E.2d 759 (Mass. 2004), argues that the Court need not delve into the fee versus tax debate because the payment is made pursuant to a voluntary contract to which the plaintiffs are successors. Anderson St. is easily distinguishable from the current case. In Anderson St., the developers were exempted from an obligation to pay real estate property taxes to Boston pursuant to a specific statutory scheme granting benefits to developers of blighted urban areas. The scheme encouraged "payments in lieu of taxes." See Mass. Gen. Laws ch. 121A, §§ 6A, 10. The payments involved in this case have no such statutory provenance. What mattered in Anderson St. was not simply the voluntariness of the contractual payment, as the City suggests, but rather that the scheme was authorized by the legislature.

[5] And non-residents. The record indicates that Marlborough permits certain residents of the neighboring Town of Hudson to use its sewer system, charging them the same use fees as residents of Marlborough.

acknowledged that Maggiore would be responsible for "all user fees for City services." Mertineit Aff., Ex. 5 at 4.

So if payments under the 1987 Agreement are not actual municipal real estate taxes (or legitimate payments "in lieu" of such) and are not the regular user fees charged Marlborough residents for use of the sewer system (or legitimate payments "in lieu" of such), what are they? According to the agreement they are "[i]n consideration for the connection to the City sewer system." Id. at 2. Put that way, they could be considered a "connection fee." But that is not an available option in this case. In the first place, Maggiore separately paid a connection fee (as well as the construction costs of connection) when the connection was first made. Moreover, any legitimate municipal service fee must not only be imposed on all users on common terms, see Berry v. Town of Danvers, 613 N.E.2d 108, 110 (Mass. App. Ct. 1993), but also must bear some reasonable relation to the costs to the municipality of providing that service. See Denver St., 970 N.E.2d at 275. A multi-million dollar fee collected in perpetuity, as the City would apparently have it, could not conceivably be regarded as a legitimate service fee reasonably related to the service provided.

Moreover, the payments cannot be regarded as a legitimate fee, as opposed to a tax, under the so-called Emerson College test. The Emerson College factors weigh heavily in St. Martin's favor. The first factor is whether St. Martin is receiving a particularized service in exchange for the payments. In Denver St., the SJC upheld a fee for new connections to the sewer system in Saugus during a time when a moratorium was placed on new connections due to environmental issues. 970 N.E.2d at 280. The SJC found that "access to the sewer system for new connections was not a benefit shared by anyone other than those who paid the [fee]." Id. Unlike in Denver St., here the plaintiff's building was connected to the sewer system when there were no

6

limitations on connections. The record indicates that the City has never denied a connection to a building located in Marlborough and has even permitted the connection of buildings completely outside of the City without additional charge. St. Martin is being charged for a service that is generally provided to the public without any charge additional to normal usage charges. It is not receiving a particularized benefit in exchange for its payments.

The third Emerson College factor calls for a determination whether the fees are collected to compensate the City for a service rendered or rather are a means of raising revenue. There is no question that this factor weighs heavily in favor of the plaintiff. The funds received are not designated to the maintenance or operation of the sewer system but rather are deposited in the City's general fund, just like tax revenues. This is a strong indicator that the payment is meant to raise revenue. Cf. Emerson College, 462 N.E.2d at 1106; Silva v. City of Fall River, 798 N.E.2d 297, 304 (Mass. App. Ct. 2003) ("Here, however, with uncontradicted evidence that the funds are deposited to Fall River's general account and nothing in the record to indicate the basis on which the charge was calculated or how the funds are used to defray expenses, we cannot conclude that the money collected is not used to subsidize general governmental operations."); Berry, 613 N.E.2d at112.

The second Emerson College factor is the voluntariness of the payment. The importance of voluntariness factor has been limited by the SJC. See Silva v. City of Attleboro, 908 N.E.2d at 728 ("Massachusetts cases decided since Emerson College . . . have consistently given less weight to the voluntariness factor. Other jurisdictions have abandoned it as unhelpful in determining whether a charge is a fee or a tax.").

In any event, even if the payments were voluntarily agreed to *by Maggiore*, it cannot seriously be contended that the payments the City now seeks would be made voluntarily *by St.*

7

*Martin*. This whole controversy arises because the City seeks to *compel* St. Martin (under threat of disconnection from the public sewer system) to make payments it does not agree to on the ground that Maggiore did agree to them a couple of decades ago.

Put aside the question whether Maggiore's agreement to make the payments "in lieu of taxes" was truly voluntary; it can be assumed so for present purposes. From the record before the Court there appear to be only two possible ways that St. Martin can now be involuntarily bound to that agreement: the 1987 Agreement could be deemed to "run with the land" so that St. Martin acquired the payment obligation under the agreement when it acquired title to the real estate, or St. Martin could be deemed to have assented to the contract by making the called-for payments from 2002 to 2012.

Neither theory can succeed for the same reason. The undisputed evidence in the record is that St. Martin did not know of the existence of the 1987 Agreement until 2012. As to the real estate theory, it is not disputed that the 1987 Agreement was never made of record as originally contemplated. It was not therefore discoverable (and not discovered) in a title examination.

Similarly, St. Martin's payments over the years are not enough standing alone to amount to an implied in fact contract. A contract may be implied in fact "if a person knowingly receives services and other benefits, and there is no evidence that those services and benefits were being furnished gratuitously." Popponesset Beach Ass'n, Inc. v. Marchillo, 658 N.E.2d 983, 987 (Mass. App. Ct. 1996). The problem is that St. Martin over the last decade has not been receiving *any* services beyond what other property owners connected to the City sewer system receive. Like those other property owners, St. Martin has paid the regularly assessed water and sewer charges. Unlike those other property owners, it has made PILOT payments for no additional service or benefit. What has been gratuitous has not been the provision of services, but the

payment of substantial sums for no services. Under these circumstances, it would be absurd to hold St. Martin contractually responsible to continue paying a considerable something for absolutely nothing in return. The very essence of a contract, implied or otherwise, is mutuality, and that is wholly lacking. Moreover, with the connection already in place, St. Martin has no choice but to remain connected to the City sewer system. 248 C.M.R. 10.05(16), Berry, 613 N.E.2d at 111. At the most, the pattern of payments may provide a reason why St. Martin cannot recoup past payments made with what may have been its own negligent inattention.

To summarize the Emerson College factors: the payment under the 1987 Agreement does not confer a particularized benefit on St. Martin which is not shared by the general public; the amount bears no relationship to the City's cost to maintain the connection to or operation of the sewer system; it is not a voluntary payment; and the payment does not reimburse the City for the actual or reasonably estimated costs but rather is deposited in the City's general fund, just like tax revenues. The payments under the 1987 Agreement are not, therefore, legitimate municipal fees for particularized service rendered. They are an illegal exaction and cannot be enforced.

## IV. Conclusion

For the reasons stated herein, the plaintiff's Motion for Summary Judgment (dkt. no. 56) is GRANTED, the City's Motion for Summary Judgment is DENIED (dkt. no. 69).

St. Martin is directed to propose a form of judgment within 14 days of the entry of this Order.

It is SO ORDERED.

                                          /s/ George A. O'Toole, Jr.
                                            United States District Judge